CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

DEC 13 2011

JULIA C. DUDLEY, CLERK
BY:
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| **JAMES GARDNER DENNIS,** **Petitioner,** | ) | **Civil Action No. 7:11-cv-00245** |
| **v.** | ) | **MEMORANDUM OPINION** |
| **WILLIAM D. JENNINGS,** **Respondent.** | ) | **By: Hon. James C. Turk** **Senior United States District Judge** |

James Gardner Dennis, a Virginia inmate proceeding pro se, filed a petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254. Petitioner argues that his conviction was obtained in violation of his constitutional rights protected by the Fourth, Fifth, Sixth, and Fourteenth Amendments. Respondent filed a motion to dismiss, and petitioner responded, making the matter ripe for disposition. After reviewing the record, the court grants respondent's motion to dismiss.

I.

By indictments filed in April and August 2008, the Commonwealth of Virginia charged petitioner with abduction, rape, sodomy, using a computer to solicit a minor, five counts of producing child pornography, and twenty counts of reproducing with intent to distribute child pornography, in violation of Virginia Code §§ 18.2-48, 18.2-61, 18.2-67.1, 18.2-374.3B, 18.2-374.1, and 18.2-374.1:1, respectively.

By the Commonwealth's motion and pursuant to a plea agreement, the Commonwealth nol prossed the abduction and production of child pornography charges. The Commonwealth also amended the remaining indictments to charge petitioner with misdemeanor sexual abuse, misdemeanor carnal knowledge, felony use of a computer to solicit a minor, and twenty counts of felony possession of child pornography, in violation of Virginia Code §§ 18.2-67.4, 18.2-361(A),

18.2-374.3(B), and 18.2-374.1:1(A), respectively.

During petitioner's guilty plea hearing, the Commonwealth proffered the evidence to support petitioner's pleas and its nol prossequi and amendments to the indictments.

> In February of 2008, there was a 911 call from a juvenile female[;] she was located at Turtle Creek Apartments. The police responded and talked with the girl, who was at that point seventeen years and nine months old. Initially, the girl stated that she had met [petitioner] online on Facebook. She indicated that he had identified himself . . . as Justin, that he had flown her here and that he had then held her against her will and raped her in an apartment at Turtle Creek. Subsequent interviews indicated some inconsistencies in her statements, specifically . . . that the two had met on a site called seekingarrangements.com, in which sugar daddies and sugar babies, the terms used on the website, seek each other out. Both [petitioner] and the female had enrolled . . . on that site and had met each other through that site. Both of them had made . . . misrepresentations about themselves. The female specifically had misrepresented her age, and there was also some [] discussion between the two of them about what might occur should they ever meet.
>
> [Petitioner] had paid to fly her [to Albemarle County] and she agreed to come here[;] . . . she was originally from Connecticut and is currently living in Connecticut. She turned eighteen years old in May – said she flew here and agreed to fly here from Connecticut. It's undisputed that certain sex acts occur[ed], but it's also now undisputed that they did leave the apartment together[;] in other words, she initially told or had neglected to tell police that they had left the apartment . . . between the time that she got here and the time that she called the police. It was later . . . revealed that they did leave the apartment, they went to Starbucks, they went to the grocery store, and there was no attempt at that point to alert anybody of what was going on or to any of the facts as she had stated them to police. The police then arrested [petitioner] for the four charges related to the girl: rape, sodomy, use of a computer to entice a minor, and abduction with intent to defile.
>
> As a result of that arrest[,] several computers were seized and other computer equipment, both at a location where [petitioner] was staying and from a car, as well as from his home. The computers were searched pursuant to search warrants for evidence pertaining to the charges relating to the juvenile female, specifically they were looking for any photographs as well as for evidence as to how the two had come to meet online.
>
> Through the course of that search[,] images were found what appeared to be minor girls and juvenile girls, and a subsequent search warrant was obtained. During the course of the search of some of the computers and the equipment[,] officers discovered images depicting child pornography, and I want to discuss here specifically the different types of

images found. The images that le[d] to the [twenty] reproduction charges . . . that are being today reduced to possession were image of prepubescent children either involved in or simulating sex acts. These were images and videos that were downloaded from other internet sites. Some of them were quite old and had been out there in cyber space for some period of time and had been downloaded onto the computers possessed by and retrieved from [petitioner]. These were originally charged as production because it appeared that several copies of these pictures had been made and they were saved to different places, but the crux of that charge, I believe, was possession. It was not reproduction of what we think of as the typical reproduction where you take a magazine and you put it on [a] copy machine and give a copy to your friend. . . .

The second set of images, and those are the five that are charged as production, were images of older females, both known and unknown. And when I say known and unknown, the images of the prepubescent children were known to persons who investigate child pornography[;] other investigations had led to the identity of these children. With respect to the five images that were charged, and these were photographs of older girls, these were --- at least one of those girls, we were able to determine [her] identity . . . through other witnesses. The second girl that is depicted in those images, we do not know the identity of, but we're narrowing down the trail . . . as to who that girl was. And it's important to distinguish between those two types of images for the purposes of the plea agreement.

For the purposes of . . . the pornography charges, as I indicated there was -- certainly the crux of it was possession that was (unintelligible), there was not really much dispute, and I believe there's going to be a straight up guilty plea to the possession of those [twenty] child pornography charges. There . . . would have been a legal dispute . . . regarding Virginia case law . . . [about] the precise manner in which these images were handled by [petitioner:] were [they] reproduction or . . . simply production. . . . [T]hat was the basis for reducing the charges to possession from reproduction.

On the production charges, with respect to the images of one of the girls, the one that was unknown and we were sort of narrowing down the trail on, there was a dispute about her age that probably could have gone either way. It's my understanding that the defense had information that it would have presented that the girl at the time the images were made was over the age of eighteen. We had evidence, we believe, to support that she was under the age of eighteen, but unlike the twenty possession images[,] these were images of girls who were much closer to the eighteen line th[a]n they were to the eight, nine, or ten year-old line that [one] might have expected. The others, with the images of the girl that knew who she was, the Commonwealth has concerns about our ability to go forward with respect to the production of the evidence and what evidence we would be able to produce. I do believe we would be able to produce some evidence concerning her age, whether that would have been admissible or whether that would have been sufficient in light of the Court's rulings[,] it's obviously up in the air.

> With respect to the February [20]08 case which sort of led to all of this—I don't want to sell the Commonwealth case too far down the river, but there were concerns about the impeachability of the victim in this case. That was one of the primary concerns for entry into a plea agreement. Not—I don't want to say—to imply from that that [sic] the Commonwealth did not believe her, but obviously [defense counsel] had information available to her that she would have very rightly been able to cross-exam[ine] this person was to indicate that she wasn't completely forthcoming in the beginning, that there were other facts that she either withheld from the police or stated incorrectly to the police, and that was a concern in terms of what a jury might ultimately do on those charges. Secondly, . . . this victim lives in Connecticut, and there are . . . issues with getting her here, which we have overcome, and she's certainly willing to come forward. . . . And, again, I don't mean to imply that I don't believe what she said, but rather that I knew that there were weaknesses in the case that would have been very rightly exploited and I did not want to put the victim through that. . . . The . . . use of a computer to entice a minor charge will require [petitioner] to register with the sexual offender registry, that was a primary concern for her. And another concern was that he plead to a sexual battery charge, whether it was a misdemeanor or a felony she was not concerned, but she did want there to be some sort of sexual battery conviction, and so her – she was consulted before this offer was made final.

(Plea Hr'g Tran. 10-16.)

Following the Commonwealth's proffer, defense counsel told the Circuit Court the reasons why petitioner, despite the original charges and evidence, intended to enter guilty pleas to the possession charges and an Alford[1] plea to the sex crimes.

> We think that the Court should accept this plea agreement. Let me begin first with the possession charges, because possession of child pornography is the truth of this case. . . . [Petitioner] is willing to be accountable for possessing child pornography, and really, that's what this case was all about from the beginning. . . . What happened was that when the police went to a residence that was inhabited by [petitioner,] they found a lap top computer[,] and there was a device attached to it called a lacy drive. A lacy drive is a storage disk. . . . whose only purpose is to store information. . . . And what I want to make clear to the Court is that this was not a case in which these images existed all over the place. They were found on the single device. . . . What this case was really about all along, although it was charged as reproduction, was a technical issue about whether [petitioner] reproduced, either by reaching out via the internet and bringing these items into his computer or there may have been evidence that we would have contested about

[1] See North Carolina v. Alford, 400 U.S. 25, 35-37 (1970).

whether the images were electronically transmitted from a lap top to this device. And I guess technically under the statute that could be viewed as reproducing, but I think the important thing that this plea agreement reflects is that if that had been the Commonwealth's evidence, and we would have presented expert testimony to the effect that basically you can save these images from the internet directly on to this device, . . which has typically been prosecuted as simple possession. . . . It was really all along a case about the possession of these materials, and [petitioner], in signing this plea agreement, has agreed to be accountable for that, and we think that's appropriate.

On the other charges, the sexual battery, the carnal knowledge, and enticement, those are frankly cases in which we have reached an agreement to serve the respective interest of the parties. We think that there was a substantial defense to those allegations and we would have defended those. However, our system of law and the Supreme Court says that it is not a misuse of plea agreements for a person to enter an Alford plea under certain circumstances, and that's what [petitioner] intends to do today.

With respect to those charges, again, let me back up and just try to quickly run though the facts. There's an exhibit in the file, it's marked as Defendant's exhibit #4, which is th[e] website on which [petitioner] and [the victim] met, seekingarrangements.com. [The prosecutor] mentioned that there were misrepresentations by both parties about themselves on this website and mentioned that [the victim] had misrepresented information about her age[;] to be more specific[,] in her [online] profile she identifies herself as a twenty-one year old. Let me be clear that there was no evidence or information in this case to suggest that [petitioner] had any other information about this person except what he learned on this website, that there was no information to suggest that he knew that this young lady was not twenty-one. She looks like someone who is in her late teens, early twenties. She doesn't look like she's . . . thirteen or twelve. She identifies herself as a high school graduate, she says that she's a waitress, and she provides other information in here. One of the things that she talks about are the circumstances under which she would be willing to meet somebody. [The profile] says [what] she expects, [stating, "Open - Amount Negotiable."] There were communications between [the victim] and [petitioner]. Everything about these communications indicates the person who is using this website to make a connection with a person and her willingness to do that.

I'll represent to the Court that I listened to a 911 call that the [victim] placed when she was still in [petitioner]'s apartment. In that 911 call[,] she initially alleges that [petitioner] came to Connecticut and brought her here, and we know that that's [sic] not true. He provided money for her to obtain a ticket and get herself to Virginia, and then he picked her up at the airport. I don't want to belabor the point [the prosecutor] made, but in our view this was a case in which there were substantial issues regarding this person's credibility. She told police, and never wavered from this statement, that [petitioner] sought her out on Facebook, and [it] just wasn't true. There was simply no evidence

anywhere that [petitioner] sought her out on Facebook. Contrary to her assertion, we know that [he] met her on seekingarrangements.com. One of the disturbing things is that she never acknowledged that, she never came back and told police[, "L]ook, you know, what I told you wasn't true.["] She maintained through several hours of interview that this is how they met.

There were, in our view, just devastating inconsistencies in her story about what happened once she arrived in Charlottesville, and that would begin with the 911 call that she placed to authorities. This is a young woman who claimed that she was raped multiple times in an apartment at Turtle Creek, and she places a call to 911. . . . [S]he's on the phone for maybe thirty, forty-five minutes with the 911 operator. In that call . . ., her initial statement to the 911 operator is[, "]I think I've been abducted, I think I've been kidnapped.["] In the 911 call, of course, the person maintains contact with her throughout the entire phone call. It turns out that she's placing the phone call from the apartment where she claims that she's been sexually assaulted and where she is now alone, and the 911 responder says, ["Y]ou know, well, maybe you better leave, I mean, do you know where he is, maybe you better leave that place.["] In that entire colloquy[,] there is never any claim by her that she's been sexually assaulted, raped or anything, to which in some people's minds is inconsistent with human nature and the way people would typically respond after a kind of violent assault that she later describes. There is not any mention of any sexual assault or anything in that entire 911 call.

Then the police arrive and she has contact with several police officers, including . . . a female police officer who asks [the victim] at the scene[, "A]re you hurt, do you need to go to the hospital,["] and she says no. In addition, what happens next is that one of the officers says[, "W]ell, you know, who are you and how old are you?["] And that's when somebody mentions that the authorities are going to contact [the victim]'s mother. Following that, we have the allegations that she was sexually assaulted.

The police conduct a lengthy interview with [the victim], it's all videotaped. I believe the videotapes – in her first recital of what happened [– the victim] talks about the events in the apartment. The police have information or somehow it comes to light that she has been out of the apartment and has gone to the grocery store and gone to Starbucks, but in her initial recitation of the facts [the victim] never talks about that. She never talks about it until she's confronted by authorities with that information, and then she says, well, yes, that did happen. And so the story she then tells is that she's taken to this apartment, she's violently raped, and then she and [petitioner] leave the apartment, they go to the [grocery store] . . . and they go to Starbucks. . . . At some point the police had asked her about the Starbucks container that she had and she had told authorities that she got that at the airport.

Had this case been tried, [petitioner] would have denied that he had any kind of forced sex with [the victim], any kind of nonconsensual sex, and he would have denied that he

knew that she was underage based on what he knew of her from this computer website. . . . I think what this plea agreement does is actually sort of thoughtfully bring together and appropriately punish what [petitioner] did. The heart of this sentencing guidelines, although the enticement is the primary offense where [petitioner] picks up substantial points, is really for the possession, and I think what the parties contemplated is that that's really the meat of this case, that's where the heart of this case [is], and that's really what [petitioner] should be punished for. And when we ran the guidelines, and that was really sort of how we were viewing why this plea agreement was appropriate. On the fringes we have these other charges that [petitioner] would simply deny that he is not guilty of, but in practicality concessions sometimes have to be made and we think that this is a circumstance under which that kind of concession is appropriate, in part because the charges, including the abduction with intent to defile, carries a potential sentence of some twenty to life on that one charge. So under circumstances it is not inappropriate for a defendant to make decisions consistent with his own best interest and enter into this kind of agreement. But we think that the sentencing guidelines reflect an appropriate sentence for the simple possession of this material, and that's really what this case is about.

(Id. 21-29.)

After hearing the Commonwealth's and counsel's recitation of the facts, the Circuit Court thanked them "because it provide[d] [it] an opportunity to understand far more about the case than [it] could have from simply reading the preliminary hearing and reading the indictments. . . ." The Circuit Court then found that the plea agreement was appropriate and accepted it based on the recited facts. Following petitioner's pleas and the colloquy, the Circuit Court made "a factual finding that's based upon [the Commonwealth's] earlier summary that there's evidence of the Commonwealth to support an acceptance of the guilty plea in each of these three charges." (Id. 46.)

After hearing the proffered facts and the evaluation of the evidence, petitioner pleaded guilty to the twenty counts of possessing child pornography and gave an Alford plea to sexual battery, carnal knowledge, and use of a computer to solicit a minor. The Circuit Court subsequently conducted the colloquy to determine whether petitioner's guilty and Alford pleas

were knowingly and voluntarily entered. After being sworn, petitioner testified that he attended college, fully understood each charge against him, understood how the government would have had to prove each charge, fully discussed the charges and his pleas with counsel, and waived his right to trial by jury.

Petitioner acknowledged that he pleaded guilty to the possession charges because he is, in fact, guilty of each charge. When asked whether he pleaded guilty to the sex offenses, petitioner denied factual guilt and referenced his Alford plea. Petitioner acknowledged that he was accepting punishment because he believes that the Commonwealth's evidence was sufficient to find him guilty even though he had evidence to the contrary. Petitioner also understood that the possession charges exposed him to up to a five-year sentence on each count and that the Circuit Court could impose these maximum sentences, which totaled 111 years' incarceration.

Petitioner also said he fully reviewed, with counsel, the applicable sentencing guidelines and the plea agreement before he signed it. Notably, petitioner testified that he decided by himself to enter his pleas after discussing the charges with counsel and he denied that anyone, including counsel, pressured, threatened, or forced him to enter his pleas. Petitioner was "entirely satisfied" with counsel's performance and understood every question the Circuit Court asked him. The Circuit Court concluded that, based on petitioner's demeanor in court and his responses, he fully understood the nature and consequences of pleading guilty and entered his pleas freely, voluntarily, and intelligently.

The Circuit Court entered petitioner's criminal judgment on January 6, 2009. The Circuit Court sentenced petitioner to an aggregate sentence of forty-three years and six months. However, it suspended thirty-two years and six months, which means petitioner must serve an

active sentence of eleven years. Most of the imposed sentence resulted from a two-year term of incarceration for each of the twenty possession charges, to which petitioner pleaded guilty. However, the circuit court suspended all but six-months' incarceration for each of the twenty possession charges.

Petitioner tried to appeal to the Court of Appeals of Virginia, but that court dismissed the appeal on November 25, 2009, because the notice of appeal was not timely filed. Petitioner did not appeal that decision to the Supreme Court of Virginia.

In March 2010, petitioner filed a petition for a writ of habeas corpus with the Circuit Court. Petitioner raised the following claims:

(A) The child pornography charges against petitioner resulted from an unlawful search that violated petitioner's Fourth Amendment rights;
(B) The charges of possession of child pornography resulted from a single act of possession and therefore, the multiple charges from one act violated the Double Jeopardy Clause of the Fifth Amendment; and
(C) Trial counsel provided ineffective assistance in that counsel by:
  (1) Failing to challenge the unlawful search and seizure of hard drives used by petitioner;
  (2) Coercing petitioner into pleading guilty;
  (3) Failing to obtain exculpatory evidence which petitioner had given details of to counsel; and
  (4) Failing to utilize the report of a psychologist as mitigation evidence at the sentencing hearing.

The Circuit Court dismissed the claims in September 2010. Petitioner appealed to the Supreme Court of Virginia, which refused the appeal because there was no reversible error in the Circuit Court's judgment.

In May 2011, petitioner timely filed the instant federal petition for a writ of habeas corpus. Petitioner presently argues the following claims:

(A) The child pornography charges against petitioner resulted from an unlawful search that violated petitioner's Fourth Amendment rights;

(B) The charges of possession of child pornography resulted from a single act of possession and therefore, the multiple charges from one act violated the Double Jeopardy Clause of the Fifth Amendment; and

(C) Trial counsel provided ineffective assistance in that counsel by:

(1) Failing to challenge the unlawful search and seizure of hard drives used by petitioner; and

(2) Coercing petitioner into pleading guilty.

Respondent requests dismissal of the petition, arguing that petitioner procedurally defaulted some claims and that the state court's adjudication of the state petition does not warrant habeas relief.

II.

A. Petitioner exhausted state court remedies.

Respondent alleges without support that petitioner failed to exhaust state court remedies for Claims (A) and (B). A federal court "may not grant a writ of habeas corpus to petitioner in state custody unless the petitioner has first exhausted his state remedies by presenting his claims to the highest state court." Baker v. Corcoran, 220 F.3d 276, 288 (4th Cir. 2000). See 28 U.S.C. § 2254(b) (mandating exhaustion). The purpose of exhaustion is to give "state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts." O'Sullivan v. Boerckel, 526 U.S. 838, 846 (1999). The exhaustion requirement is satisfied by finding that the "essential legal theories and factual allegations advanced in federal court . . . [are] the same as those advanced at least once to the highest state court." Pruett v. Thompson, 771 F. Supp. 1428, 1436 (E.D. Va. 1991), aff'd, 996 F.2d 1560 (4th Cir. 1993) (citing Picard v. Connor, 404 U. S. 270, 275-76 (1971)). Therefore, petitioner must present both the same argument and factual support to the state court prior to filing the claim with a federal

court. Anderson v. Harless, 459 U. S. 4, 6-7 (1982).

Petitioner presented all three main claims in his state habeas petition, and respondent, in fact, responded to all three. Therefore, it is not possible to find that petitioner failed to present these claims to the Supreme Court of Virginia after appealing the Circuit Court's dismissal. Accordingly, petitioner's claims are exhausted and respondent's motion to dismiss is denied on this basis.

B. Petitioner procedurally defaulted Claims (A) and (B).

A federal habeas claim is procedurally defaulted when "a state court has declined to consider the claim's merits on the basis of an adequate and independent state procedural rule." Hedrick v. True, 443 F.3d 342, 359 (4th Cir. 2006). A state court's finding of procedural default is entitled to a presumption of correctness, provided two foundational requirements are met. See 28 U.S.C. § 2254(d); Clanton v. Muncy, 845 F.2d 1238, 1241 (4th Cir. 1988). First, the state court must explicitly rely on the procedural ground to deny petitioner relief. See Ylst v. Nunnemaker, 501 U.S. 797, 802-03 (1991); Harris v. Reed, 489 U.S. 255, 259-61 (1989). Second, the state procedural rule used to default petitioner's claim must be an independent and adequate state ground for denying relief. See Ford v. Georgia, 498 U.S. 411, 423-24 (1991); Harris, 489 U.S. at 260. A state procedural rule is "independent" if it does not depend upon a federal constitutional ruling and "adequate" if it is firmly established and regularly or consistently applied by the state court. Yeatts v. Angelone, 166 F.3d 255, 263-64 (4th Cir. 1998).

Case 7:11-cv-00245-JCT-RSB Document 20 Filed 12/13/11 Page 11 of 17 Pageid#: 331

The Circuit Court reviewed petitioner's state habeas petition and explicitly dismissed Claims (A) and (B) pursuant to Slayton v. Parrigan, 215 Va. 27, 305 S.E.2d 680 (1974).[2] The United States Court of Appeals for the Fourth Circuit has "repeatedly recognized that the procedural default rule set forth in Slayton constitutes an adequate and independent state law ground for decision." Fisher v. Angelone, 163 F.3d 835, 844 (4th Cir. 1998) (internal quotations omitted). Therefore, the Circuit Court dismissed these claims pursuant to an independent and adequate state procedural rule, and petitioner procedurally defaulted these claims. See Ylst, 501 U.S. at 805 (holding that when state court's ruling offers no explanation, reviewing court should look to next reasoned opinion below). Petitioner fails to establish cause and prejudice or a fundamental miscarriage of justice to excuse the default. See Coleman v. Thompson, 501 U.S. 722, 753-54 (1991). Accordingly, the court dismisses Claims (A) and (B) as procedurally defaulted.

C. The state court's adjudication of petitioner's ineffective assistance of counsel claims does not warrant habeas relief.

Federal courts grant habeas relief "only on the ground that [the petitioner] is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). After a state court addressed the merits of a claim also raised in a federal habeas petition, a federal court may not grant the petition unless the state court's adjudications of a claim is contrary to, or an unreasonable application of, clearly established federal law, or based on an unreasonable determination of the facts. 28 U.S.C. § 2254(d).

The evaluation of whether a state court decision is "contrary to" or "an unreasonable

[2] Slayton precludes a Virginia court from reviewing a non-jurisdictional claim in a petition for a writ of habeas corpus when that claim could have been presented at trial and on appeal but was not.

application of" federal law is based on an independent review of each standard. Williams v. Taylor, 529 U.S. 362, 412-13 (2000). A state court determination is "contrary to" federal law if it "arrives at a conclusion opposite to that reached by [the United States Supreme] Court on a question of law or if the state court decides a case differently than [the United States Supreme] Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 413. A federal court may also issue the writ under the "unreasonable application" clause if the federal court finds that the state court "identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. This reasonableness standard is an objective one. Id. at 410. A Virginia court's findings cannot be deemed unreasonable merely because it does not cite established United States Supreme Court precedent on an issue if the result reached is not contrary to that established precedent. See Mitchell v. Esparza, 540 U.S. 12, 16 (2003). Furthermore, "[a] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." Wood v. Allen, 558 U.S. ___, 130 S. Ct. 841, 849 (2010). A federal court reviewing a habeas petition "presume[s] the [state] court's factual findings to be sound unless [petitioner] rebuts 'the presumption of correctness by clear and convincing evidence.'" Miller-El v. Dretke, 545 U.S. 231, 240 (2005) (quoting 28 U.S.C. § 2254(e)(1)). See, e.g., Lenz v. Washington, 444 F.3d 295, 300-01 (4th Cir. 2006). Finally, "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." Cullen v. Pinholster, __ U.S. __, 131 S. Ct. 1388 (2011).

To prove ineffective assistance of counsel, a petitioner must satisfy the two-pronged test set forth in Strickland v. Washington, 466 U.S. 668 (1984). If a petitioner has not satisfied one

prong of the Strickland test, the court does not need to inquire whether he has satisfied the other prong. Strickland, 466 U.S. at 697. Furthermore, "an attorney's acts or omissions that are not unconstitutional individually cannot be added together to create a constitutional violation." Fisher v. Angelone, 163 F.3d 835, 852-53 (4th Cir. 1998).

The first prong of Strickland requires a petitioner to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment[,]" meaning that counsel's representation fell below an objective standard of reasonableness. Strickland, 466 U.S. at 687-88. Strickland established a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689. "Judicial scrutiny of counsel's performance must be highly deferential" and "every effort [must] be made to eliminate the distorting effects of hindsight . . . and to evaluate the [challenged] conduct from counsel's perspective at the time." Id. Furthermore, "effective representation is not synonymous with errorless representation." Springer v. Collins, 586 F.2d 329, 332 (4th Cir. 1978).

The second prong of Strickland requires a petitioner to show that counsel's deficient performance prejudiced him. Strickland, 466 U.S. at 692. To establish prejudice, a petitioner must show that there is a "reasonable probability that, but for counsel's errors, the result of the proceeding would have been different." Id. at 694. "A reasonable probability is a probability sufficient to undermine the confidence of the outcome." Id.

In Claim (C)(1), petitioner argues that that counsel was ineffective for failing to challenge the search and seizure of his hard drives as unlawful. The state habeas court denied this ineffective assistance of counsel claim. The state habeas court implicitly found the record

demonstrated that the search warrants were facially valid and that petitioner did not make a showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit and, thus, any claim of false statements in the affidavit were conclusory and not accompanied by a detailed offer of proof. The state habeas court also found the record demonstrated that counsel was aware of the police's actions in requesting and executing the search warrants and correctly believed that there were no grounds to challenge the search warrants.

The state habeas court's judgment was neither contrary to nor an unreasonable application of federal constitutional law or based on an unreasonable determination of the facts. To overcome the presumption of validity for an affidavit supporting a search warrant, a "challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth . . . accompanied by an offer of proof." Franks v. Delaware, 438 U.S. 154, 171-72 (1978). However, petitioner failed to present the Circuit Court with "a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit." Id. at 155-56. Therefore, petitioner fails to establish that counsel performed deficiently for not challenging the warrant. Petitioner also cannot establish prejudice because his knowing and voluntary guilty pleas waived all non-jurisdictional defects that preceded the guilty pleas. Tollett v. Henderson, 411 U.S. 258, 267 (1973).

In Claim (C)(2), petitioner alleges that counsel coerced him into pleading guilty by threatening that she would cease her representation if he did not plead guilty. The state habeas

court rejected this claim because petitioner said during his plea colloquy that he decided for himself to plead guilty, that he was in fact guilty of possession of child pornography charges, and that he entered the Alford pleas because the Commonwealth's evidence was overwhelming. Petitioner also reiterated during the colloquy that his attorney did not pressure, threaten, or force him to enter his pleas. The state habeas court also held that the record demonstrated that counsel did not coerce petitioner's pleas.

The state habeas court's judgment was neither contrary to nor an unreasonable application of federal constitutional law or based on an unreasonable determination of the facts. Petitioner's knowing and voluntary statements clearly reflect his understanding of the Circuit Court's questions about his pleas, and petitioner reiterated that he entered his pleas without any undue external influence. Petitioner pleaded guilty to possession because he was, in fact, guilty of these charges. By entering Alford pleas, petitioner "voluntarily, knowingly, and understandingly consent[ed] to the imposition of a prison sentence even if he [wa]s unwilling or unable to admit his participation in the acts constituting the crime." Alford, 400 U.S. at 37. Petitioner entered these pleas even after listening to defense counsel and the Commonwealth describe the facts, law, and evidence of the case. Accordingly, the Circuit Court correctly determined petitioner voluntarily and intelligently entered his pleas, and petitioner fails to establish deficient performance or prejudice.

III.

For the foregoing reasons, the court grants respondent's motion to dismiss. Based upon the court's finding that petitioner has not made the requisite substantial showing of a denial of a constitutional right as required by 28 U.S.C. § 2253(c), a certificate of appealability is denied.

The Clerk is directed to send copies of this Memorandum Opinion and the accompanying Order to the petitioner and counsel of record for the respondent.

**ENTER**: This 13th day of December, 2011.

James C. Turk
Senior United States District Judge